*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEREMY JON LEHRE,

        Defendant-Appellant.

UNPUBLISHED
June 24, 2021

No. 348185
Chippewa Circuit Court
LC No. 17-003419-FC

Before: GADOLA, P.J., and SAWYER and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his convictions and sentence for tampering with evidence in a criminal case punishable by more than 10 years, MCL 750.483a(6)(b); larceny in a building, MCL 750.360; first-degree felony murder, MCL 750.316(1)(b); and home invasion in the second degree, MCL 750.110a(3). He was sentenced to concurrent terms of 5 to 10 years in prison for tampering with evidence, 12 months in prison for larceny in a building, mandatory life in prison without the possibility of parole for felony murder, and 8 to 15 years in prison for second-degree home invasion. He raises four separate challenges to the underlying convictions, mostly arguing that trial counsel should have sought to admit evidence of his limited intellectual capacity to explain his confused statements to the police shortly after the murder. We affirm.

## I. FACTS AND PROCEEDINGS

This case arises from a home larceny and fatal assault of the home resident during the early morning of November 1, 2017. That night, defendant, Aaron Lehre ("Aaron"), and two others spent time at the victim's home to drink alcohol and generally have "a good time." Unfortunately, defendant became belligerent with the victim after becoming intoxicated, which culminated in a fight between the two. Defendant was somehow able to bring the victim to the ground, at which point he repeatedly kicked the victim in the head. After the victim was rendered unconscious, defendant and Aaron ransacked the victim's home, stealing multiple pill bottles. The victim was declared dead several hours later.

Defendant and Aaron were quickly identified as suspects. Defendant immediately placed the blame for the fatal assault upon Aaron. However, the police investigation showed otherwise.

-1-

Defendant was consequently charged with multiple offenses, including open murder. Trial counsel sought an insanity defense, but the trial court found defendant competent to stand trial after a psychiatric evaluation. Trial counsel nonetheless sought to admit the testimony of Dr. Devers, vaguely informing the trial court that he intended to use Dr. Devers to show that defendant had a limited intellectual capacity. The trial court, having received no indication to the contrary, assumed that trial counsel sought to introduce evidence of "diminished capacity," which was precluded by *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001). The trial court accordingly refused to allow Dr. Devers's testimony.

The jury found defendant not guilty of first-degree premeditated murder and guilty of the remaining charges.[1] A few weeks later, trial counsel was dismissed as defendant's counsel because of a breakdown in the attorney-client relationship. Thereafter, appellate counsel moved for a new trial, raising the same issues that he now raises on appeal. The trial court denied the motion, and the matter is now before this Court.

## II. INTELLECTUAL CAPACITY

Defendant argues that trial counsel was ineffective for (1) failure to argue that evidence of his limited intellectual capacity was admissible under *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008), to explain his confused statements to the police; (2) deciding to call defendant to testify because doing so compounded the problems presented by his intellectual capacity; and (3) alternatively, with respect to the first argument, the trial court committed evidentiary error by refusing to admit evidence of his intellectual capacity.

To the extent that defendant raises an issue of ineffective assistance, that issue is preserved for review because defendant raised it in his motion and accompanying brief for a new trial. See *People v Thorne*, 322 Mich App 340, 346-347; 912 NW2d 560 (2017). However, "[w]hen . . . an evidentiary hearing has not been held, our review is limited to mistakes apparent from the record." *Id.* at 347. "Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012) (quotation marks and citation omitted). "This Court reviews findings of fact for clear error and questions of law de novo." *Id.*

Additionally, an "[e]videntiary error does not require reversal unless after an examination of the entire cause, it appears more probable than not that the error affected the outcome of the trial in light of the weight and strength of the properly admitted evidence." *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011).

### A. Ineffective Assistance/*Yost*

"To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness

---

[1] The conviction for murder in the second degree was vacated on the basis of double jeopardy.

and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant." *Heft*, 299 Mich App at 80-81.

In *Carpenter*, decided in 2001, our Supreme Court held as follows:

> [B]y enacting a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation, the Legislature has signified its intent not to allow a defendant to introduce evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. [*Carpenter*, 464 Mich at 226.]

This Court decided *Yost* seven years later. In *Yost*, the defendant-mother acted strangely and suspiciously when her daughter died. See *Yost*, 278 Mich App at 347-349. Her defense counsel sought to admit evidence of her limited intellectual capacity for the following reasons:

> As an alternative explanation for defendant's seemingly odd behaviors and comments, defendant's trial counsel wanted to present expert testimony about defendant's limited intellectual capabilities. Indeed, during opening arguments, defendant's attorney noted that defendant was mentally challenged and argued that, because of her limitations, defendant appeared confused and could be easily manipulated into making apparently incriminating statements. Defendant's trial counsel stated that a psychologist would testify about defendant's limited intellectual capacity and explain how it affected defendant's ability to communicate. [*Id*. at 349.]

The trial court refused to allow admission of such testimony, and the defendant was ultimately convicted. *Id*. at 343, 351. This Court reversed, reasoning as follows:

> Although a defendant may no longer present evidence of diminished capacity to negate the intent element of a crime, there are circumstances where a defendant's mental capacity may make a fact that is of consequence to the determination of the action more or less probable without such evidence being offered to negate the specific-intent element of the charged offense.
>
> * * *
>
> In response to the prosecution's evidence, defendant's trial counsel attempted to show that defendant's statements and actions were not evidence of guilt when understood in light of her limited education and intellectual capabilities. Likewise, defendant's trial counsel wanted to present evidence that a person of defendant's intellect is easily manipulated into making statements that might appear to reflect a guilty conscience. . . . Therefore, to the extent that this evidence was offered for a purpose other than to negate the intent element of the charged offenses, the evidence was not barred by the rule stated in *Carpenter*, *supra*, even though it dealt with defendant's limited mental capacity. [*Id*. at 355-358 (citations omitted).]

In the case before us, it is unclear whether trial counsel was aware of *Yost* because he did not testify at the post-trial hearing. However, it is apparent that he should have presented *Yost* and the rationale therein to the trial court. Simply put, *Yost* stands for the proposition that a defendant may, in certain cases, introduce evidence of his or her limited intellectual capacity to explain otherwise peculiar or incriminating conduct. If the *Yost* defendant was able to present such evidence, it seemingly follows that defendant should have been able to present such evidence to explain his confused police interview. Indeed, his reported IQ of approximately 54 is unquestionably quite low, and there is no apparent trial strategy that would justify trial counsel's failure to invoke *Yost* or otherwise refuse to disclose to the trial court how he intended to use evidence of defendant's limited intellectual capacity. Thus, it is arguable that trial counsel may have performed deficiently in this respect.

However, because we conclude that defendant has failed to show a reasonable probability that the outcome of trial would have been different if Dr. Devers had testified consistent with *Yost* we need not reach such a conclusion.[2] The undisputed evidence showed that defendant became aggressive with the victim earlier that night and physically struck him during a subsequent fight. It also showed that defendant was discovered by the police that night completely submerged in a bathtub with "pinkish" colored water, and the most straightforward reason for defendant doing so was that he was trying to wash the blood from his person. This showed a consciousness of guilt. Further, the doctor who treated defendant for his relatively minor injuries that night testified that defendant had developing bruises on his shins "and kind of into the feet," which would be consistent with a strong kicking motion. Aaron testified that defendant was responsible for assaulting the victim, which was consistent with the neighbor's testimony that Aaron was extremely troubled by defendant's alleged actions shortly after the fight. Finally, the victim's blood was found on defendant's shoes but not Aaron's shoes, which suggests that he was responsible for kicking the victim.[3] These facts, taken together, provided strong evidence that defendant was responsible for assaulting and murdering the victim, making it improbable that trial counsel prejudiced defendant.

Further, given the fact that defendant's fingerprint was found on a pill bottle belonging to the victim—and he does not appear to dispute on appeal that he was guilty of theft from the house—the evidence clearly established that he was guilty of the predicate felony of larceny in a

---

[2] We note that defendant, in his motion for a new trial, only introduced evidence from Dr. Devers that he had a limited intellectual capacity. Defendant did not introduce evidence that actually connected his limited intellectual capacity to his confused statements to the police, as did the *Yost* defendant. Defendant moved to expand the record with an affidavit from Dr. Devers to that effect, and we conditionally denied his motion. *People v Lehre*, unpublished order of the Court of Appeals, entered March 19, 2021 (Docket No. 348185). For the purposes of this appeal, we accept the argument raised in defendant's reply brief that the connection between a limited intellectual capacity and confused statements to the police is clear to a layperson and does not require expert testimony. Further, for the reasons explained herein, we find it unnecessary to expand the record on remand.

[3] The DNA result identifying the blood on defendant's shoes was the result of "STR-mix" analysis and is the subject of his third issue.

building for the purposes of felony murder and the related charge of second-degree home invasion. Additionally, defendant does not dispute that he was found in a bathtub shortly after the assault in circumstances indicating that he was trying to wash the blood from his person, which shows tampering with evidence. Significantly, given these facts, defendant does not offer any argument as to how evidence of his limited intellectual capacity would be inconsistent with his conviction. Hence, there is no reasonable probability that the failure to admit such evidence to explain his confused police interview affected the outcome of trial.

Importantly, the police interview, which defendant argues illustrates the impact of his intellectual limitations, did not appear to be critical evidence against defendant. The prosecutor only briefly questioned defendant about it on cross-examination, and only briefly referenced it during her closing argument. In this respect, this case is unlike *Yost* where this Court concluded that a new trial was warranted because the prosecutor emphasized the defendant's seemingly incriminating conduct and statements:

> During closing arguments the prosecution repeatedly and vigorously argued that defendant's unusual behavior and statements were clear evidence of guilt. The prosecution noted that, although defendant supposedly was not aware that something was wrong with Monique when she failed to get up from her nap, the neighbor immediately knew something was wrong and began to help. The prosecutor also noted that defendant refused to get into the ambulance and argued that defendant stopped crying when the nurse left the room at the hospital because there were "no more witnesses." The prosecutor also played excerpts of defendant's recorded statements during closing arguments to punctuate the prosecution's claims that defendant deliberately killed Monique to punish and silence her. The powerful emotive effect of this use of defendant's recorded statements was evident even in the transcription. [*Yost*, 278 Mich App at 366 n 3.]

Such an emphasis was not present in the case before us. Accordingly, in light of the substantial incriminating evidence, it is not reasonably probable that Dr. Devers's testimony affected the outcome of trial.

B. Ineffective Assistance/Defendant as Witness

"A defendant's right to testify in his own defense arises from the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Although counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011) (citations omitted). "If the accused expresses a wish to testify at trial, the trial court must grant the request, even over counsel's objection." *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985). Nonetheless, trial counsel's advice to a defendant regarding whether to testify can nonetheless establish the basis for a claim of ineffective assistance, depending on the nature of the advice and the corresponding trial strategy. See *People v Tommolino*, 187 Mich App 14, 16-17; 466 NW2d 315 (1991). Further, trial counsel's failure to acquiesce to a defendant's decision to testify or not testify is necessarily ineffective assistance. See *United States v Mullins*, 315 F3d 449, 454 (CA 5, 2002).

Here, the record shows that the trial court advised defendant concerning his right to testify on the third day of trial and that trial counsel also privately advised defendant concerning the right. The record is silent as to why defendant ultimately testified. It may have been entirely his own decision to testify, or trial counsel may have convinced him to do so despite his wishes to the contrary.[4] In the absence of such a factual record, we must conclude that defendant was not coerced into testifying and is not entitled to relief on this basis.

The only other avenue for relief, therefore, is through a showing that trial counsel somehow advised defendant inappropriately or otherwise engaged in an unsound trial strategy by calling defendant to testify. Because trial counsel invoked his Fifth Amendment right to remain silent at the post-trial *Ginther*[5] hearing, there is no specific factual record as to these matters. But the existing record supports a conclusion that trial counsel may have had a sound strategy for calling defendant to testify—he may have wanted to show the jury that defendant had nothing to hide and that his demeanor indicated that he was being truthful when he denied assaulting the victim. Consequently, there is no basis for awarding defendant relief on the basis that trial counsel provided him with inappropriate advice or engaged in an unsound trial strategy.

## C. Evidentiary Error

Defendant briefly argues in the alternative that the trial court committed evidentiary error when it refused to admit evidence of his limited intellectual capacity. See MRE 401 (providing that relevant evidence is generally admissible). This argument is meritless. The prosecutor filed a motion in limine to bar the admission of such evidence. The purpose of such a motion is to discuss and decide whether the evidence in dispute is legally admissible at trial. See *Lapasinskas v Quick*, 17 Mich App 733, 737 n 1; 170 NW2d 318 (1969). Because trial counsel failed to offer any legal basis for admission of the challenged evidence, the trial court cannot be faulted for excluding it. Regardless, even if the trial court committed evidentiary error, reversal is not warranted because—for essentially the reasons already explained—defendant has not shown that it is more probable than not that the error affected the outcome of trial. See *Benton*, 294 Mich App at 199.

## III. *PEOPLE V CARPENTER*

Defendant argues that *Carpenter* was incorrectly decided and that it should be overruled.[6] Specifically, he argues that *Carpenter* should be overruled so he may introduce evidence of his limited intellectual capacity, i.e., diminished capacity, as a defense to the specific intent required

---

[4] Defendant does not argue on appeal that trial counsel coerced him into testifying.

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] Whether a decision of our Supreme Court should be overruled is a question of law reviewed de novo. See *Bezeau v Palace Sports & Entertainment, Inc*, 487 Mich 455, 461; 795 NW2d 797 (2010) (opinion by WEAVER, J.).

for larceny, the predicate offense here for felony murder.[7]  As defendant concedes, however, this Court and the trial court are bound to follow *Carpenter* because it is a decision of our Supreme Court.  See *Paige v City of Sterling Heights*, 476 Mich 495, 524; 720 NW2d 219 (2006).  We therefore decline to address his argument but acknowledge that it has been preserved in this Court.

## IV. *PEOPLE V MUHAMMAD*

Defendant also argues that our Supreme Court should overrule *People v Muhammad*, 326 Mich App 40; 931 NW2d 20 (2018), such that the STR-mix results indicating the presence of the victim's blood on his shoes would be deemed inadmissible.[8]  He argues only that *Muhammad* itself was incorrectly decided and that it should be overruled by our Supreme Court.  He does not argue that the trial court here should have conducted an independent *Daubert* analysis and reached a contrary ruling than *Muhammad*.  Nor does he argue that this Court should convene a conflict panel.  Thus, because this Court is otherwise bound by *Muhammad*, MCR 7.215(C)(2), we decline to address his argument but again acknowledge that it has been preserved in this Court.[9]

## V. PROSPECTIVE JURORS OATH

Defendant argues that the trial court erred by not personally administering the oath to the prospective jurors on the record, which violated MCR 6.412(B), MCL 768.10, and due process.  Because defendant did not object in the trial court, this issue is not preserved for review.  See *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006).  "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights."  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  If a defendant satisfies these three requirements, "reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence."  *Id*. at 763-764 (cleaned up).

---

[7] Because larceny is a specific-intent crime, *Thorne*, 322 Mich App at 348, and because the mens rea for felony murder includes "the mens rea required for the underlying felony," *People v Hughey*, 186 Mich App 585, 591; 464 NW2d 914 (1990), a successful defense to the specific intent required for larceny would necessarily be a successful defense to felony murder as well.

[8] *Muhammad* held that "STR-mix" results satisfy *Daubert v Merrell Dow Pharms, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and are therefore admissible.

[9] Incidentally, we note that the case on which defendant principally relies, *United States v Gissantaner*, 417 F Supp 3d 857 (WDMI 2019), was reversed by the United States Court of Appeals for the Sixth Circuit on March 5, 2021.  See *United States v Gissantaner*, 990 F3d 457 (CA 6, 2021).  In that case, the Sixth Circuit concluded that STR-mix satisfied FRE 702 and *Daubert*, observing that "numerous courts have admitted STRmix over challenges to its general acceptance in the relevant scientific community."  *Id*. at 466.  "All in all, STRmix satisfies Rule 702 and the case law construing it.  In the words of Rule 702, it is the 'product of reliable principles and methods.' "  *Id*. at 467.

MCR 6.412(B) provides as follows:

>    **Instructions and Oath Before Selection**.  Before beginning the jury selection process, the court should give the prospective jurors appropriate preliminary instructions and must have them sworn.

M Crim JI 1.4 provides for the following oath to prospective jurors:

>    (1) I will now ask you to stand and swear to answer truthfully, fully, and honestly all the questions that you will be asked about your qualifications to serve as a juror in this case. If you have religious beliefs against taking an oath, you may affirm that you will answer all the questions truthfully, fully, and honestly.

>    (2) Here is your oath: "Do you solemnly swear (or affirm) that you will truthfully and completely answer all questions about your qualifications to serve as jurors in this case?"

MCL 768.10, which concerns potentially biased prospective jurors and is relied upon by defendant, provides as follows:

>    The previous formation or expression of opinion or impression, not positive in its character, in reference to the circumstances upon which any criminal prosecution is based, or in reference to the guilt or innocence of the prisoner, or a present opinion or impression in reference thereto, such opinion or impression not being positive in its character, or not being based on personal knowledge of the facts in the case, shall not be a sufficient ground of challenge for principal cause, to any person who is otherwise legally qualified to serve as a juror upon the trial of such action:  Provided, That the person proposed as a juror, who may have formed or expressed, or has such opinion or impression as aforesaid, shall declare on oath, that he verily believes that he can render an impartial verdict according to the evidence submitted to the jury on such trial: Provided further, That the court shall be satisfied that the person so proposed as a juror does not entertain such a present opinion as would influence his verdict as a juror.

MCL 768.10 thus provides that when a prospective juror has "formed or expressed" an opinion or impression of the case, he or she may only be on the jury by giving an oath declaring impartiality.  It does not concern the general oath that must be given to prospective jurors, and it will not be discussed further.

According to defendant, MCR 6.412(B) implicitly requires that the oath be given both by the trial court itself and on the record.  Further, according to defendant, the failure to comply with MCR 6.412(B) in this respect is a violation of due process.

With regard to whether the trial court must personally administer the oath, MCR 6.412(B) provides that the trial court "must have them sworn."  MCR 6.412(B) does not direct the trial court itself to swear in the jury; it simply directs the trial court to ensure that the jury is ultimately sworn before the jury selection process begins.  The absence of such language directing the trial court to administer the oath itself indicates that the oath may be administered by another individual, such

as the court clerk. In this regard, MCR 6.412(B) is consistent with MCR 6.412(F), which provides as follows: "After the jury is selected and before trial begins, the court must have the jurors sworn." That is, the language "must have them sworn" in MCR 6.412(B) is almost identical to the language "must have the jurors sworn" in MCR 6.412(F). And MCR 2.511(H)(1) provides that the selected jury "must be sworn by the clerk." MCR 2.511(H)(1) thus shows that the language in MCR 6.412(F)—and by extension, the language in MCR 6.412(B)—does not require the oath to be administered by the trial court itself.

As to whether the oath must be administered on the record, MCR 6.412(B) is silent, and that question does not appear to have been answered by Michigan courts. However, caselaw from other jurisdictions show that a jury oath (i.e., the oath provided to the selected jury) need not be administered on the record. For instance, in *United States v Pinero*, 948 F2d 698 (CA 11, 1991), there was no record that the defendants' jury was administered an oath before trial. *Id*. at 700. The court held that the defendants were not entitled to relief, explaining that the defendants offered "no affidavits from attorneys, the court reporter, or anyone else present in the courtroom on February 1, 1990[,] to support their assertion that the jury did not receive its oath." *Id*. "The mere absence of an affirmative statement in the record . . . is not enough to establish that the jury was not in fact sworn." *Id*. Similarly, in *Montgomery v State*, 206 Md App 357; 47 A3d 1140 (2012), the defendant argued he was entitled to a new trial because there was nothing in the record establishing that his jury was sworn before trial. *Id*. at 371. The Court of Special Appeals of Maryland, after engaging in an extensive analysis of foreign caselaw, held that the defendant was not entitled to a new trial because "the presumption of regularity applies to the issue of whether or not a jury has been sworn," and the defendant "failed to rebut the presumption." *Id*. at 380.[10]

As cases such as *Pinero* and *Montgomery* illustrate, the question in such cases is whether the jury actually was administered an oath, not whether the jury was administered an oath on the record. Although those cases concerned the oath applicable to an empaneled jury, the reasoning also would apply to the oath applicable to prospective jurors. Thus, defendant cannot show error unless the prospective jurors were not actually administered the proper oath, or unless he can identify a court rule, statute, or Michigan caselaw specifically requiring on-the-record administration of such oaths, which defendant has not done. Defendant also does not dispute the affidavit of the court clerk—and affirmation by the trial court after trial—establishing that the proper oath was administered to the prospective jurors. Therefore, we conclude that MCR 6.412(B) was not violated in this case.

With regard to his due-process argument, defendant cites no authority for the proposition that the failure of a trial court to personally administer the oath to prospective jurors on the record violates due process. Indeed, we cannot identify any federal caselaw holding that the failure to administer *any* oath to prospective jurors violates due process. To the contrary, a few federal district courts have indicated otherwise in unpublished opinions. See, e.g., *Hunter v Lesatz*, No. 2:18-CV-11117, 2020 WL 2085076 (EDMI April 30, 2020) ("Hunter also is not entitled to relief

---

[10] "The presumption of regularity has been recognized in Michigan." *People v Carson*, 19 Mich App 1, 7 n 10; 172 NW2d 211 (1969). In any event, we note that the trial court personally confirmed on the record after trial that the oath was administered by the court clerk.

on the basis of his argument that the failure to swear the jury venire violated due process. Hunter fails to cite a case holding that the federal Constitution requires a trial court to swear a jury venire prior to voir dire."). If it does not violate due process to fail to administer *any* oath to prospective jurors, it seemingly follows that administering the *proper* oath by a court clerk and off the record does not violate due process.

Accordingly, we conclude that defendant has not shown any error, much less plain error, by the manner in which the oath was administered.

Alternatively, assuming that the manner in which the oath was administered violated both MCR 6.412(B) and due process, defendant cannot establish entitlement to relief. In *People v Cain*, 498 Mich 108; 869 NW2d 829 (2015), the court clerk erroneously administered to the empaneled jury the oath given to prospective jurors before voir dire. *Id.* at 113. The defendant did not object and was ultimately convicted. *Id*. at 114. Our Supreme Court ruled that the defendant was not entitled to a new trial for the failure to properly swear in the jury, reasoning that although the parties agreed that the defendant showed plain error affecting substantial rights, he could not show that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings:

> Our review of the record in this case reveals that the error of failing to properly swear the jury did not undermine the proceedings with respect to the broader pursuits and values that the oath seeks to advance.
>
> One of the primary purposes of the oath—to impart to the members of the jury their duties as jurors—was alternatively fulfilled in large part by the trial court's instructions prescribing the particulars of the jurors' duties. Immediately before the swearing of the oath, the trial court instructed the jurors, "I will now ask you to stand and swear to perform your duty to try the case justly and to reach a true verdict." Following the oath, the court instructed the jurors that it was their responsibility to decide the facts of the case solely on the basis of the evidence presented and the law as the court gave it to them, that they should not consider any other information regarding the trial that was not presented in the courtroom, that they should not discuss the case among themselves until deliberations begin, and that they should keep an open mind about the case, setting aside any bias and prejudice. The trial court also explained the concepts of the presumption of innocence and reasonable doubt . . . . [*Id*. at 123.]

In a footnote, the Court noted that it did not decide whether the failure to properly swear in the jury constituted a mere violation of a court rule or a Sixth Amendment violation because the defendant had to satisfy the plain-error standard in either event. *Id*. at 117 n 4.

Here, given that the prospective jurors were in fact sworn in before questioning, it is apparent that the "primary purpose" of the oath was effectuated, namely, clarifying for the jurors that they must answer the questions truthfully. In addition, before the voir dire itself, the trial court explained to the prospective jurors the importance and necessity of having "a fair and impartial jury." As in *Cain*, the duties required by the oath were clearly imparted to the prospective jurors, and the solemnity of the proceedings was clearly communicated as well. Thus, defendant has not

shown that any error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." See *Carines*, 460 Mich at 763-764.

## VI. CONCLUSION

There were no errors warranting relief. Accordingly, we affirm.

/s/ Michael F. Gadola
/s/ David H. Sawyer
/s/ Michael J. Riordan